SWEARINGEN v. SWEARINGEN.
(No. 5715.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 24, 1917. On Motion for Rehearing, March 21, 1917.)

1. PROCESS ⬤⟳149 — RETURN OF OFFICER—EVIDENCE.

In order to set aside the return of an officer on a citation, the evidence must be clear and satisfactory, and there should be two witnesses or one witness with strong corroborating evidence.

[Ed. Note.—For other cases, see Process, Cent. Dig. §§ 202–205.]

2. TRIAL ⬤⟳365(3) — SPECIAL VERDICT — EFFECT.

The effect of a special verdict under the statute is such that the trial court would have no right to ignore any material portion of the same in drawing the judgment, even though he found the evidence insufficient to sustain such portion under the rules of law applicable thereto, but would have to set aside the entire verdict or give effect to all of it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 873.]

3. TRIAL ⬤⟳352(4)—SUBMISSION OF ISSUES.

In an action to set aside a decree of divorce, which made a division of community property on agreement of the parties, and for a divorce, or in the alternative to set aside the division of property, where the case was submitted on special issues, if the court was satisfied that the evidence on an issue was not sufficient it should not submit the issue, or if it was desired to have questions of credibility determined the question should be so worded as not to cover the entire issue.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 840.]

4. DIVORCE ⬤⟳167—DECREE—ACTIONS TO SET ASIDE—FINDINGS.

As plaintiff's cause of action in so far as it relates to the issue whether the divorce should be set aside is barred by limitation, a jury finding that plaintiff was not properly served with citation and copy of the petition in the divorce action was immaterial.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

5. PROCESS ⬤⟳149—RETURN—EVIDENCE—SUFFICIENCY.

Evidence *held* insufficient to set aside the return of the sheriff, since deceased, showing that plaintiff was properly served with citation and copy of the petition in the divorce action.

[Ed. Note.—For other cases, see Process, Cent. Dig. §§ 202–205.]

6. DIVORCE ⬤⟳80—SERVICE OF PROCESS—RETURN—VALIDITY.

An objection to a return on a citation in the divorce case on the ground that the sheriff wrote and signed it, although the service was

in fact made by a deputy, would be without merit.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. § 264.]

7. DIVORCE ⬤⟳160 — VOIDABLE DEFAULT JUDGMENT.

Where the judgment and sheriff's return on the citation in the divorce action were sufficient to show personal service on the defendant therein, it was not void, but merely voidable, upon showing by evidence aliunde the record that it was invalid.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. § 521.]

8. DIVORCE ⬤⟳167—ACTION TO SET ASIDE DECREE—LIMITATIONS.

As the judgment and record in the divorce action affirmatively showed service, and was only voidable upon showing by evidence aliunde the record that it was invalid, a suit to set it aside, on the ground that defendant was not properly served with citation, was barred at the expiration of four years after such defendant learned that the divorce had been granted.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

9. APPEAL AND ERROR ⬤⟳930(1)—REVIEW—VERDICT.

On review of the evidence to support a verdict for plaintiff in deference to the verdict, the evidence most favorable to plaintiff must be accepted as true.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755, 3756, 3758.]

10. DIVORCE ⬤⟳249(2)—COMMUNITY PROPERTY—EVIDENCE—SUFFICIENCY.

Evidence *held* to warrant a jury finding that the fair market value of the community estate at the time of the divorce decree was $16,958.24.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. § 704.]

11. HUSBAND AND WIFE ⬤⟳271—DIVISION OF COMMUNITY PROPERTY—FRAUDULENT REPRESENTATIONS.

If a husband on separation from his wife promised future contributions for her support and maintenance, intending at the time to disregard his promise, making it only to deceive his wife, such promise, in case the refusal to perform took place, would amount to such actual fraud as would justify and authorize the rescission of a contract for division of community property induced by such promise.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 989–1002.]

12. DIVORCE ⬤⟳255 — CONCLUSIVENESS OF JUDGMENT—KNOWLEDGE OF CAUSE OF ACTION—EVIDENCE.

Evidence *held* to support a jury finding on special issues submitted that plaintiff did not have knowledge of fraud of her husband in stating the amount of community property, and promising to contribute to her future support, or of any fact that by the exercise of due diligence would have led her to discover such fraud, prior to four years before bringing the action.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 722–724.]

13. DIVORCE ⬤⟳252—ACTION TO SET ASIDE DECREE—COMMUNITY PROPERTY.

The court properly divided the community estate equally, and deducted from the plaintiff's half the payment made under the former agreement, there being no merit in the contention that the division should be made as in a divorce action.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 713–715.]

---

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

On Motion for Rehearing.

**14. DIVORCE ☞167 — SETTING ASIDE—FALSE TESTIMONY—FAILURE TO TESTIFY.**

As plaintiff knew as soon as she knew the judgment was rendered whether or not, as to the divorce portion, it had been rendered on false testimony, and that the testimony related to facts with which she was conversant, if the testimony upon which the decree of divorce was false her failure to testify was such an act of neglect that she was in no position to ask that said portion of the decree be set aside.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

**15. DIVORCE ☞167—SETTING ASIDE AGREEMENT FOR DISTRIBUTION OF PROPERTY—FALSE TESTIMONY.**

Where a husband, instead of serving his wife with citation and copy of the petition in a divorce action, and letting her come into court to settle her property rights, by fraudulent representations procured an agreement from her, which not only fixed all such rights, but which operated to induce her not to come into court to settle such rights, the rule that where a party fails to appear and answer he cannot subsequently maintain an action to set aside a judgment obtained upon false and perjured testimony because of the neglect of the defendant to appear and answer in the suit, did not apply in an action seeking to set aside such agreement.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

**16. DIVORCE ☞167—DIVISION OF PROPERTY—SETTING ASIDE—FALSE TESTIMONY.**

Where a husband was the only person who could testify in a divorce action that an agreement of the parties was a fair division of community property, the rule that where a party fails to appear and answer he cannot subsequently maintain an action to set aside a judgment obtained upon false and perjured testimony because of the neglect of the defendant to appear and answer in the suit, did not apply in an action by divorced wife to set aside such judgment.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

**17. DIVORCE ☞167—DIVISION OF PROPERTY—SETTING ASIDE—FALSE TESTIMONY.**

Where false testimony as to the amount of community property was willfully given by a husband in a divorce action, and the wife was not chargeable with negligence in failing to prevent a decree being rendered on such testimony, the courts will entertain a suit to set aside the judgment.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 533–548.]

**18. LIMITATION OF ACTIONS ☞100(4)—FRAUD—CONCEALMENT.**

As a husband is in a restricted sense a trustee for his wife as to community property, where a husband had turned community property into notes and money and falsely represented its amount to his wife to secure her assent to an agreement for division in a divorce action, and by a promise to contribute to her support induced her to go to another state, there was such a concealment of the husband's fraud as would prevent the statute of limitations from running until the fraud was discovered, or by reasonable diligence should have been.

**19. LIMITATION OF ACTIONS ☞197(2)—EVIDENCE—SUFFICIENCY.**

In an action to set aside a decree of divorce, which made a division of community property on agreement of the parties, or in the alternative to set aside the division of property, evidence *held* to support a jury finding that plaintiff was not chargeable with lack of due diligence in discovering her husband's fraud in concealing the amount of their community estate.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 724.]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Suit by Lela Swearingen against A. J. Swearingen. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 165 S. W. 16.

Swearingen & Ward, and John H. Bickett, Jr., all of San Antonio, for appellant. C. L. Bass and C. J. Matthews, both of San Antonio, for appellee.

MOURSUND, J. This suit was instituted by appellee on November 5, 1913. On October 24, 1914, plaintiff filed her amended petition in the Seventy-Third district court, to which the case had been transferred from the Forty-Fifth district court on account of the disqualification of Judge Tayloe, who was made a defendant. In this petition she named the following parties as defendants: A. J. Swearingen, Samuel G. Tayloe, Sidney J. Brooks, William Cassin, P. H. Swearingen, M. H. Burris, Z. W. Cannon, and Miranda Sterling.

The petition is lengthy, and we shall only undertake to state briefly the nature thereof. Plaintiff sued to set aside a decree of divorce between herself and A. J. Swearingen, rendered by the district court of the Forty-Fifth judicial district on January 29, 1906, in a suit instituted by A. J. Swearingen, in which decree the community property was awarded to said A. J. Swearingen, pursuant to an agreement to that effect made part of the decree and signed by both parties to said suit, which was found by the court to evidence a just division of the community property. As ground for setting aside the decree in its entirety, plaintiff, Lela Swearingen, alleged that she had never been served with citation and a copy of the petition in said divorce suit by any officer, and that the return on the citation purporting to have been made by H. Mebus, deputy sheriff of El Paso county, was and is untrue, and was made by accident, fraud, or mistake of said officer. She further alleged that she was prevented from defending said suit by fraud, duress, and wrongs on the part of A. J. Swearingen; that A. J. Swearingen had conceived a scheme to get rid of her and their children, and to defraud her out of the bulk of the community estate, and that he induced her, by the statement that he wanted to move to California and invest the money there, to execute conveyances and assist in reducing said estate to cash; that after they reached Ft. Worth, on their way to California, he told her that he did not intend to live with her any longer, but persuaded her to go on to California with the children, by representing

to her that he intended to permanently provide for and support her and the children; that after reaching California he wrote her to the effect that he wanted a divorce, and in the fall of 1905 he wrote her, representing that he wanted to make a fair division and settlement of their community estate, and requested her, in order that this might be accomplished, to meet him at El Paso; that his real purpose was to get her into the state of Texas so that citation could be served upon her so that if she did not accept the division proposed by him she would be compelled to contest the divorce case; that she relied upon his representations and met him in El Paso, and then learned from him that he had sued her for divorce, and for that reason wanted to make a division and settlement of their community estate; that he again represented to her that he intended to permanently provide for and support her and the children in addition to what he would give her in the division, and represented that since she had been in California he had invested and lost the community estate, except about $1,200 in cash, which he offered her on condition that she would sign the instrument quoted in the divorce decree; that he had given her $600 for living expenses when she went to California and had expended $200 for railroad tickets, and he insisted that these sums should be added to the $1,200, in stating the consideration in said agreement; that he threatened not to make any division at all if she refused his offer; that the representations so made were false, but she believed and relied upon same and executed the agreement. She further alleged that she did not discover the facts showing that the judgment of divorce had been illegally obtained against her until the summer of 1913, nor the facts showing the fraudulent conduct of A. J. Swearingen by which she was induced to execute said agreement, and that she did not know until said time of any facts which would have led her, by exercising due diligence, to discover the facts that she did discover. She also alleged that she returned to California, that he did not support her, and that she had not means sufficient to investigate the facts prior to the summer of 1913, when she made a visit to Texas. She alleged that at the time she executed the agreement that when the divorce decree was granted, the community estate was worth from $25,000 to $50,000, and that since then it has increased in value to $100,000. She then described the property claimed by her to constitute such estate, and alleged that the other defendants in the suit are claiming some kind of right or interest in some of such property, and that she made them parties to the suit in order that they might defend such interest as they had.

She further pleaded a cross-action for divorce, dependent on the court setting aside the former decree. In addition she pleaded

that the original answer of A. J. Swearingen alleges that he has married Miranda Sterling since said decree of divorce was rendered, and that children have been born to them, and that by reason of said fact Miranda Sterling is entitled to an interest in the property now held by him; that for such reason she has joined Miranda Sterling as a defendant, but plaintiff denies that Miranda Sterling has any interest in said property held by A. J. Swearingen.

Plaintiff's prayer is very lengthy, and its main features will be understood from the foregoing statement of her pleadings. Such portions as we may find necessary to state fully will be set out in connection with the assignments relating thereto.

On November 6, 1914, defendant A. J. Swearingen filed his original answer, in which, after pleading a general demurrer, and various special exceptions, he denied all the material allegations in plaintiff's petition; alleged that the division shown by the agreement was fair; pleaded that plaintiff's cause of action was barred by laches and by the statute of limitations of two and four years; alleged his marriage to Miranda Sterling and the birth of children to them; and pleaded estoppel to set aside the decree of divorce.

Plaintiff, on October 11, 1915, filed her first amended supplemental petition, alleging she had been a bona fide inhabitant of the state for a period of more than twelve months and a resident of Bexar county for more than six months next preceding the filing of such instrument of pleading; denied the allegations contained in defendants' pleadings; again alleged that the judgment was void, basing her contention on section 1, article 14, of the federal Constitution, and the same grounds theretofore pleaded by her. She also alleged that the sales of community property owned by A. J. Swearingen and her amounted to over $20,000, and that the community estate, at the time of the signing of the agreement, was worth over $15,000 or $20,000.

On October 11, 1915, defendant Swearingen filed a supplemental answer containing exceptions, some of which were sustained, a denial of the allegations of the supplemental petition, and allegations describing in detail the property sold by plaintiff and defendant from March to November, 1904, as well as the community debts paid; the amount of community property lost after November, 1904, and before November, 1905; also the amount of defendant A. J. Swearingen's separate property, November 21, 1905. The defendants, other than A. J. Swearingen, answered that they owned jointly an undivided half interest in a tract of land described in plaintiff's petition, the other half of which was owned by A. J. Swearingen.

The cause was submitted on special issues and a verdict returned, upon which the court

rendered judgment in favor of plaintiff against A. J. Swearingen for $6,479.12, with interest thereon at the rate of 6 per cent. per annum from November 21, 1905, and that the other defendants go hence without day and recover of plaintiff all costs expended by them.

Plaintiff's pleadings were framed with the view: First, of procuring the setting aside and vacation in its entirety of the judgment of divorce rendered by the district court of Bexar county on January 29, 1906, and securing a divorce upon her petition, as well as a division of all the property held by A. J. Swearingen at the date of trial; and, second, if for any reason she could not procure the setting aside of that part of the decree divorcing the parties, then she sought to vacate and set aside that part of the decree relating to the division of property as well as the written agreement which was the basis of such part of the decree, urging as grounds therefor that fraud had been used in procuring such agreement which continued and existed at the time judgment was entered upon the faith thereof. The judgment of the court ignores the first theory, but grants relief on the second. If the decree should be entirely set aside, the questions relating to property rights would be different from those raised upon this appeal, so we will first dispose of all questions relating to the first theory.

The judgment contains no statement of the reasons relied upon by the court in deciding against plaintiff in so far as she sought to set aside the portion of the decree relating to divorce. Appellee, by cross-assignment, attacks such holding, but fails to state what the theory of the court was. Appellant has failed to answer appellee's brief, so we are at a great disadvantage in considering and discussing this matter. We find that a special exception was sustained to paragraph 6 of plaintiff's first supplemental petition in which she pleads that the decree is void. A cross-assignment, one of those urged conditionally, however, presents as error such ruling. No exception appears to have been sustained to those portions of the original petition attacking the judgment on the ground that plaintiff was not served with citation by any officer. The court submitted to the jury the issue whether the citation and copy of petition had been delivered to Lela Swearingen by Mebus, deputy sheriff, and the jury answered in the negative. Such issue, however, was included among those which the jury was directed not to answer if they found in answer to the first issue that the division made in El Paso was fair and equitable, or if they found in answer to the second issue that plaintiff knew the approximate value of the community estate at the time she signed the agreement. This fact shows that the court was of the opinion that plaintiff was not entitled to set aside the divorce, but whether he considered such is-

sue eliminated by rulings on exceptions, or thought limitation barred plaintiff from such relief, is not clear. Said issue was evidently submitted on the theory that it might be material in deciding property rights, and not for the purpose of determining whether plaintiff was entitled to set aside the divorce.

[1] A. J. Swearingen contended in his motion for new trial, and contends in his brief, by assignment of error No. 7, that the answer of the jury to said special issue is contrary to the law and the evidence. Mrs. Lela Swearingen did not file any motion for judgment upon the verdict nor any motion for new trial, but by her first cross-assignment of error contends that because of such finding judgment setting aside the divorce decree in its entirety and granting her a division of the property owned at the time of the trial should have been rendered by the trial court. So far as this issue is concerned, this case is one of the class of cases in which it is held that the issue is not to be determined like an ordinary issue of fact by a mere preponderance of the evidence. We realize the difficulty confronting the trial court when evidence is to be tested by certain rules, established by our decisions, and yet such rules cannot be given in charge to the jury for fear that the jury will accept the same as an intimation of the weight to be given to the testimony. We have heretofore had occasion to discuss this matter. See Western Assurance Company v. Hillyer, Deutsch, Jarratt Co., 167 S. W. 820. It is established by our decisions that in order to set aside the return of an officer on a citation the evidence must be clear and satisfactory; also that there should be two witnesses or one witness with strong corroborating evidence. Gatlin v. Dibrell, 74 Tex. 36, 11 S. W. 908; Randall v. Collins, 58 Tex. 232; Kempner v. Jordan, 7 Tex. Civ. App. 275, 26 S. W. 870.

[2, 3] It is the duty of the courts to apply these rules, but we are of the opinion that the effect of a special verdict is such under our statute that the trial court would have no right to ignore any material portion of the same in drawing the judgment, even though he found the evidence insufficient to sustain such portion under the rules of law applicable thereto. Fant v. Sullivan, 152 S. W. 515. He would have to set aside the entire verdict or give effect to all of it. If satisfied that the evidence is not sufficient it would be proper not to submit the issue, or if it was desired to have questions of credibility determined, the question could be so worded as not to cover the entire issue. Under the rules applicable to special verdicts, appellee's first cross-assignment shows error, unless said finding is immaterial on account of undisputed facts which conclusively show that regardless of such finding plaintiff is precluded from having the divorce set aside, for the issue is found by us not to

have been eliminated by rulings on pleadings. Fant v. Sullivan, supra.

[4, 5] We believe that plaintiff's cause of action, in so far as it relates to the issue whether the divorce should be set aside, is barred by limitation, and that therefore said finding is immaterial. This matter will be discussed further on. We do not see how said finding is material to sustain the judgment rendered, so from any viewpoint it appears necessary to pass on the sufficiency of the evidence. But as the testimony on which such finding is based is attacked by appellant, and the finding may be considered material by the parties, we conclude, without stating and discussing the evidence, that it is insufficient under the decisions hereinbefore cited to justify setting aside the return of an officer whose lips are sealed by death. The testimony of Lela Swearingen shows that she could easily be mistaken about this matter, and it cannot be said to be strongly corroborated.

We pass to the question of limitation above mentioned, and will briefly state the facts material to the issue.

The petition of A. J. Swearingen was filed in the district court of Bexar county on November 17, 1905, praying for divorce and division of community property. Citation issued to El Paso county on the same day, and was returned and filed on November 24, 1905, with the return showing that it came to hand on November 20, 1905, at 11 o'clock a. m., and was executed in El Paso county, Tex., on November 21, 1905, at 10 o'clock a. m. by delivering to Lela Swearingen in person a true copy of the citation. together with the accompanying certified copy of plaintiff's original petition. The return was signed "J. H. Comstock, Sheriff El Paso county, Tex., by H. Mebus, Deputy," and contained, in lieu of statement of amount of fee, the words "Fees paid." The judgment herein attacked was rendered on January 29, 1906. It recites that the defendant Lela Swearingen "had been duly cited to appear by personal service in accordance with law," but failed to appear or to answer. It recites the introduction of evidence and decrees a divorce. It then contains a finding that A. J. Swearingen and Lela Swearingen had entered into an agreement which is then copied into the judgment. This agreement is the one mentioned in plaintiff's petition as having been made at El Paso. It recites the date of their separation as November 26, 1904; that it was intended that it should be permanent; that A. J. Swearingen had filed suit for divorce on November 17, 1905, in the Forty-Fifth district court of Bexar county; that an equitable division of the community estate is therein agreed upon; that Lela Swearingen is perfectly familiar with the condition and quantity of the property belonging to the estate at date of agreement; that she has demanded $2,000 as the fair and equitable share of the community estate, and in consideration of such sum cash in hand paid to her and of the household goods in her possession, she releases and conveys to him all the property then belonging to the community estate. The judgment recites findings to the effect that said agreement evidences a fair and equitable division, and that the $2,000 has been paid, and adjudges all the property of the community estate to A. J. Swearingen.

[6] The evidence discloses that H. Mebus, deputy sheriff of El Paso county, at the time the return of the citation was made, died on June 29, 1913. J. H. Comstock, the sheriff, testified by depositions that the return is in his handwriting, having been made by him for H. Mebus, in the presence and at the request of the latter upon the statement of Mebus that he served the citation upon Lela Swearingen at the time stated in the return. No objection is made to the return on the ground that the sheriff wrote it and signed it, although the service was in fact made by the deputy, and in fact we think such an objection would be without merit. Goddard v. Harbour, 56 Kan. 744, 44 Pac. 1055, 54 Am. St. Rep. 608. We therefore conclude that both the judgment and return on the citation are in all respects sufficient under the law to show personal service of citation upon Lela Swearingen. In this connection, though perhaps unimportant, we call attention to the fact that none of the proceedings disclosed that Lela Swearingen was not a resident of the state.

A. J. Swearingen married Miranda Sterling on March 5, 1906, and two children have been born to them. Lela Swearingen was informed by A. J. Swearingen of such marriage shortly after it occurred, and the evidence shows conclusively that she did not file her suit until at least seven years after she learned of the granting of the divorce. The question arises upon the foregoing facts whether such a judgment is void or voidable, which is a material inquiry in order to determine whether the statute of limitations applies to this suit.

This court, after considering the cases of Crawford v. McDonald, 88 Tex. 631, 33 S. W. 626, Templeton v. Ferguson, 89 Tex. 47, 33 S. W. 329, and other cases, stated its conclusions in the case of Dunn v. Taylor, 42 Tex. Civ. App. 241, 94 S. W. 347, in the following language:

"There is, according to numerous Texas decisions, a distinction between a judgment which, though really void, carries in its records the evidence of validity and one which bears on its record the proofs of its own invalidity. The one is held subject only to direct attack, the other may be attacked under any and all circumstances wherever it presents itself. The first is voidable, the latter is void. In other words, it is held that the recitation in a judgment of jurisdictional facts, if not contradicted by the record, will be presumed to be true, and they cannot be denied or questioned in any collateral proceeding. It will be readily seen that under this rule any judgment not containing evidence in its record of its own invalidity should never

be termed void, for whenever it is necessary to present proof aliunde to show its nullity it must necessarily be a voidable judgment. Such must be the case with a judgment fully reciting personal service, which is not contradicted by the record, when in reality there has been no such service. On its record it is a valid judgment, and the fact that there may be evidence aliunde the record, which would show it invalid, does not make it void, but places it in the category of voidable judgments."

A case specially worthy of notice in this connection is that of Hamblin v. Knight, 81 Tex. 351, 16 S. W. 1082, 26 Am. St. Rep. 818. It was a suit to enjoin the collection of a judgment, the petition in which was said by the court to be substantially a suit for new trial. It was filed before the term expired at which the judgment was rendered and without any allegations tending to show that the remedy by a motion for new trial was not adequate. Plaintiff alleged that he had never been served with citation nor voluntarily appeared, notwithstanding the sheriff had returned a citation for him as duly served. The court said:

"We feel constrained, however, by the decisions of this court, to hold that when it was admitted that the term of the court at which the judgment was rendered had not adjourned when the original petition was filed, the court did not err by charging the jury to find for the defendant."

In the case of Owens v. Cage & Crow, 101 Tex. 286, 106 S. W. 880, it was held that the holding in the case of Hamblin v. Knight is well supported by authority. It is apparent from the opinion in said case of Hamblin v. Knight that as the suit was brought in the court in which the judgment was rendered, and attacked the judgment, the court considered the suit as substantially a suit for a new trial, and yet sustained the judgment of the trial court directing a verdict for defendant because a motion for new trial should have been resorted to, although the issue had been made by pleading and evidence that no service of citation upon Hamblin had been procured and no appearance entered by him.

[7] In view of the authorities above mentioned, it is clear that the judgment sought to be set aside in this case is not a nullity, but is voidable upon attack made in the mode and within the time prescribed by law. In the case of Foust v. Warren, 72 S. W. 404, Chief Justice Conner said:

"In view of another trial we will add, upon the issue of limitation, that while a judgment or record affirmatively showing service may, in a direct proceeding, as this was, be attacked, and shown to be void because of a want of service or appearance in fact, yet we see no reason why, in such case, the action would not be barred at the expiration of four years after appellee discovered, or by the use of reasonable diligence might have discovered, the existence of the judgment."

See, also, Stewart v. Robbins, 27 Tex. Civ. App. 188, 65 S. W. 899; Watson v. T. & P. Ry. Co., 73 S. W. 830; Lane v. Moon, 46 Tex. Civ. App. 625, 103 S. W. 211; Rose v. Darby, 33 Tex. Civ. App. 341, 76 S. W. 799.

[8] We conclude that Mrs. Lela Swearin-gen's suit to set aside the judgment in so far as it decreed a divorce was barred by limitation when she filed it, for more than seven years intervened between the time she learned that the divorce had been granted and the institution of her suit. It follows that we must hold that no error was committed by the trial court in so far as the case involved the first theory presented by plaintiff's pleadings, and appellee's first cross-assignment must be overruled.

We will now consider the questions relating to the second theory.

The jury found that the money and property received by plaintiff was not a fair and equitable division of the community estate belonging to plaintiff and defendant as it existed on November 21, 1905, and that the fair market value of the said estate at said time was $16,958.24. These findings are attacked as unsupported by evidence, and it is contended that the amount so found is grossly excessive to say the least. As these findings are based upon the same evidence, the assignments attacking them will be considered together. Appellant contends that the testimony of both plaintiff and defendant corroborated by written instruments made at the time of the sale of their property shows that defendant received in notes and cash $16,554.84 for all property he had; that out of this sum defendant paid community debts amounting to $3,875.83; that he lost by investment in a restaurant in Mexico $3,000; and that $5,000 was the value of his separate property acquired before marrying plaintiff. According to these figures, the true value of the community estate on November 21, 1905, would be about $4,679.01. As part of the estate consisted of notes which had to be collected, appellant contends that giving plaintiff the $1,200 at El Paso, the $200 for railroad fare from Ft. Worth to California, $600 cash when she first went to California, and the household effects, constituted a fair division.

We will first take up the evidence as to the value of the estate on November 26, 1904. At some time prior to March 1, 1904, defendant conceived the idea of selling out all of his property in and near Sonora, and going to some other place. The jury was warranted in finding that the idea of selling out was prompted by his desire to separate from his wife and procure a divorce from her, and that she did not know such design until informed by him at Ft. Worth, after everything had been sold, that he did not intend to live with her any longer. The evidence does not show clearly how long prior to March 1, 1904, he formed the intention of selling out. He testified that he probably started "closing out and offering property for sale before January or February, 1904." If defendant determined at any time while closing out the property to conceal from plaintiff the value of their estate, it is not disclosed by the evi-

dence, for she testified he told her after selling out that he was worth $40,000. Other persons testified to statements by him of the value of his estate. These statements differed, the most conservative estimate being made to Joe Brasher, who had worked for defendant for two years as foreman. He told Brasher he would sell out and have about $25,000 or $30,000 to invest near San Antonio in a farm. He told T. D. Word he would clear out with about $30,000. At San Angelo he stated he had $60,000. Defendant contends that none of these statements should be given probative force; his theory being that they are all shown to be false by the testimony of himself and plaintiff, corroborated by copies of deeds, etc. He contends that plaintiff was familiar with all of his business dealings. Plaintiff testified she thought she knew everything he had, and expressed the conviction that he had assets amounting to $40,000 after selling out, but said she did not know where he had the same. It is apparent that she had no accurate knowledge of the number of cattle he had, and that she was not familiar with his financial transactions other than as was disclosed by the papers she signed, and that she did not know whether the considerations recited were actually paid or not. The jury discredited defendant's testimony, and we find certain conflicts between his testimony and that of other witnesses, as well as inconsistencies between his contentions in the brief and the undisputed testimony. It is true that the consideration received for real estate added to price received for cattle and horses sold Ira Wood in October, 1904, makes the sum of $16,554.84. To this may be added the average balance in the Sonora bank prior to March 1st, which was from $300 to $500.

[9] Now, let us see whether this constituted the entire community estate. In deciding this question, in deference to the jury's verdict, the evidence most favorable to plaintiff must of course be accepted as true. Joe Brasher testified that just before and during the year 1904 defendant had between 600 and 700 cattle, of the market value of $15 per head. This value is also shown by various other witnesses, one of whom stated that according to what defendant told him, there were about 80 head of black muley cattle, which the witness testified were of the market value of $18 or $20 and that defendant's other cattle were of the market value of $15 per head. Defendant says he sold Sol Mayer about 40 yearling and two year old steers at $11 and $15 per head. The number in each class was not stated. Estimating half in each class, they brought $520. This sum is not included in the $16,554.84. Defendant testified he sold Mayer early in the spring. At another time he testified he sold some steers to Mayer when he sold the last bunch of cattle. Did he sell two bunches to Mayer? If not, according to his testimony, all the

remainder were butchered by him and sold in his meat market during the year 1904. He testified there were 15 head of horses included in the 300 head of stock sold to Ira Wood. He therefore sold Wood 285 cattle and Mayer 40, and taking the lowest number mentioned by Brasher as correct must have butchered 275 head of cattle. He makes no contention that he lost money in his market business, and it is evident that he did not, for he purchased 20 or 30 fat cows which he butchered and sold, in addition to those from his herd. He designated those sold to Wood as his "remnant," and the jury was warranted in finding that he butchered the most valuable of his cattle, for he only received $10 per head for the "remnant," while the evidence supports a finding that the entire herd was worth more that $15 per head. The jury was justified in finding that as the 285 head left over and sold Wood only brought $10 per head, the 275 head butchered were worth $20 per head, and brought that amount. This would make an additional sum of $5,-500 to be added to the $16,554.84. In fact, the evidence supports a finding of a greater sum than this, for these figures would make an average value of $15 per head, while the testimony of Wood is that the 80 head of black muley cattle were worth $18 or $20 per head, and the others $15 per head. Again Brasher testified that defendant had about 30 horses of the market value of $25. Brasher testified defendant sold horses to Word & Gilliam. The only horses accounted for by defendant were the 15 head sold Ira Wood, which he described as of very little value, and which he sold at $10 per head. The assessor testified that defendant's horses were of the market value of $25 per head. The jury was warranted in finding that defendant sold 15 head of horses, the best he had, before selling the remainder to Ira Wood, and that said horses brought him more than $25 per head. This would make at least $375 to be added to the other amounts. Brasher testified that defendant had 40 or 50 hogs worth $5 each. Defendant, when he sold the ranch to Morris, had only a few hogs left, which he estimated at $35 and included with the land for the consideration stated in the deed. The others, according to the testimony, were butchered, and the jury could find that they brought approximately $200. The notes held by defendant brought him a considerable sum in interest which accrued thereon during the year, but we will not undertake to estimate it. Defendant, as shown by the record, is a shrewd business man, who rapidly accumulated property, and the jury was warranted in finding that his various business enterprises were profitable, and that he only sold out because he intended to move away and separate from his wife. They were justified in finding that the profits from his meat market, which was not sold until August 29, 1904, and from his ranch business

were ample to support the family, and that he paid out no part of the money derived from sales of stock to provide a living for his family. Since some stress is laid on the fact that plaintiff got some household effects when she went to California, it will not be amiss to say that according to her testimony they were of little value, and it is evident that the furniture was sold, and proceeds not included in amount contended for by defendant.

We find that defendant testified as follows:

"I don't remember that I had a balance in the bank in the beginning of the year 1904 considerably over $5,000. I will not say it is not a fact. It seems like I did pay the bank some money I owed them. I can't say whether I did or not."

[10].Defendant failed to show what debts, if any, he paid out of any $5,000 deposit, if he had such a deposit. One of the officers of the Sonora bank testified that defendant in March paid said bank a balance of $400 on a note to the bank, but there is no explanation by defendant or any one else concerning such transaction. In view of the matters discussed and the uncertainties disclosed by defendant's testimony, we conclude that the jury could find that the lowest estimate of the net value of his estate, namely, $25,000, was not an exaggeration.

It is contended in the brief that defendant paid community debts amounting to $3,875.83. We find that this statement is not entirely accurate. The bill of Dieter & Sauer for $125 was incurred on March 5, 1905, and there is nothing to show that it was not included in the $3,000 loss suffered in Mexico. Defendant testified he paid $200 in commissions for sale of land to Cope and Mayer. We find that Mayer drew on defendant for $75 in compromise of suit for commission. As the $200 includes the $75, the latter item should be excluded from the list of debts paid. Excluding these items, we have debts aggregating $3,675.83. Of these, the $70 debt to Houghton & Robinson and the $125 paid Cope as commission rest upon the uncorroborated testimony of defendant. The evidence shows clearly that all of these debts were paid prior to November 16, 1904, with the exception of the bills of Houghton & Robinson, and Mayer, and possibly those due Cope and Woodruff. Defendant says he paid the Houghton & Robinson bill after leaving Sonora and part of the commissions, evidently that due Mayer. He paid Woodruff on November 16, 1904. Defendant withdrew $6,300 from the bank about November 16, 1904. The evidence does not show whether Cope and Woodruff were paid prior to this withdrawal or subsequent thereto, probably prior thereto, as the withdrawal was made in contemplation of departure. By adding the $6,300 withdrawn from the bank, we have $16,502.84 after paying practically all debts. This in itself refutes the theory that defend-

ant paid the community debts out of proceeds of sales of lands.

It may also be said that the evidence is not conclusive to the effect that Sterling paid the $1,100 for the home place prior to November 16, 1904. Defendant testified that he thought Sterling paid cash. Again he testified that he drew on Sterling with deed attached, and that the draft was paid; that the sale was made "something like October." Although other deeds are introduced in evidence, we fail to find the Sterling deed in the statement of facts. There is a credit on one of the Morris notes for $674.72, but this amount was not received in cash, but in a note by Thompson to Morris executed November 14th or 15th, which was collected later on by defendant. As illustrative of how defendant was collecting other money than that mentioned in the brief, we call attention to the fact that in March, 1904, he paid off $1,019.61, while he collected none of the money mentioned in the brief; in May $498.60, and in the meantime he had collected $400 from Wilcox; in June $1,542, and he had collected another $200 from Wilcox.

We will next discuss briefly the testimony relied upon to show that defendant's separate property amounted approximately to $5,000. We find that he married plaintiff on December 9, 1889, and moved to Sutton county March 3, 1890. On August 30, 1889, he sold 100 acres of land for $3,000 of which $1,000 was paid in cash, $350 in two horses and a wagon, and the remainder in notes. On January 19, 1889, he had sold 6⅔ acres of land for $133.66 evidenced by a note due October 1, 1889. This note was paid and the other notes were sold during the winter of 1889. It is true that plaintiff and her father denied that defendant owned these lands, but in view of the deeds in evidence, and of the property purchased by defendant en route to Sonora, such denials are entitled to no weight. Defendant estimated the value of his separate property at $4,865. It appears, however, that $350 received in horses and wagon as part payment for land has been counted twice in arriving at said sum, and 40 head of cattle have been figured at $10 per head, when the defendant's testimony warranted the jury in valuing same at only $8 per head. It also appears that defendant was continually buying and selling stock, and that he had 40 head of cattle, according to his testimony, when he married. He admits that he kept no account, so it is not clear that he did not use all or part of the $1,000 cash received in August in acquiring the 40 head of cattle on hand when he married. Plaintiff testified that when she married defendant he owned 12 or 15 cows, a few hogs, and a few horses. In deference to the verdict, we must find that aside from the money derived from the land he had only such live stock as plaintiff described. As the jury is allowed considerable latitude in passing on

testimony of an interested party, we think they could have arrived at the conclusion from all the evidence that $3,500 was about the value of defendant's separate estate. Even if defendant's separate estate was worth $5,000, the amount found by the jury is not excessive, for deducting said sum and the $3,000 loss from the lowest estimate of the net value of the estate, viz. $25,000, would leave $17,000. We cannot say how the jury arrived at the amount found by them, but we conclude in view of all the testimony that it cannot be said that their finding is excessive. We therefore overrule the first and second assignments of error.

The third assignment attacks the finding of the jury in answer to question No. 4 as unsupported by pleading and evidence. The proposition merely raises the issue made by the first assignment, namely, whether the division was fair. This issue has already been disposed of adversely to appellant. The latter portion of the assignment is really an objection to the form of the issue which should have been made before the charge went to the jury. The assignment is overruled.

[11, 12] The fourth and fifth assignments attack the finding in answer to the seventh question, to the effect that plaintiff did not have knowledge of the fraud found in answer to the fourth question, or of any fact that by the exercise of due diligence would have led her to discover such fraud, prior to four years before November 5, 1913. The acts of fraud relied on in the pleadings were two: First, that defendant told plaintiff he had lost all of the estate except $1,200; and, second, that he promised future contributions for her support and maintenance. Appellant contends that a promise to perform future acts is not fraud in law, but an exception to this general rule is recognized in Texas, in this: That if at the time the promise is made it was the design and intention of the party making it to disregard it, and he had no intention to perform it, and it was only made to deceive and entrap the other party, then such promise, in case the refusal to perform took place, would amount to such actual fraud as would justify and authorize the rescission of a contract induced by such promise. Mutual Reserve Life Ins. Co. v. Seidel, 52 Tex. Civ. App. 278, 113 S. W. 945, and cases therein cited. In view of the way the question was worded, we must consider any act of fraud pleaded to have been found by the jury if there is any evidence to support such a finding. Plaintiff testified, and in deference to the verdict we find such testimony to be true, that defendant told plaintiff he had lost all of the estate except $1,200, and that she believed him. The estate consisted of money and notes. Plaintiff, relying upon and believing this statement, returned to California with her children, and on account of financial stringencies never returned to Texas

until 1913, when she discovered that defendant had acquired the title to real estate in Bexar county at a time and under circumstances indicating that he had practiced a fraud on her and had misrepresented the condition of the community estate. She filed suit soon thereafter. We have examined the testimony carefully, and conclude that the finding of the jury in answer to the seventh question is supported by the evidence. This conclusion also disposes of the sixth assignment of error.

The seventh assignment has been discussed by us in considering the first theory advanced by plaintiff, and it was there held the finding in answer to the eighth question is not necessary to sustain the judgment.

The eighth, ninth, and tenth assignments are overruled.

Appellee's second cross-assignment reads as follows:

"The court erred in adjudging and decreeing that the sum of $16,958.24 be divided by two and from one-half, to wit, $8,479.12, and there be deducted the sum of $2,000; and that appellee have and recover of appellant the sum of $6,-479.12, with interest thereon at the rate of 6 per cent. per annum from the 21st day of November, 1905."

The proposition submitted thereunder is the following:

"The judgment of the court should have divided the community estate of appellant and appellee existing on November 21, 1905, in such a way as was just and right having due regard to the rights of each party and their children; and in view of the fact that appellee since then has had exclusive charge of and support of the children and in view of all the record in this cause a just and rightful division of said estate entitled appellee to a much larger proportion than one-half of the community property, and a judgment should be here rendered accordingly."

[13] We do not think there is any merit in the contention made. The divorce was not set aside. This is not a division made upon granting a divorce, and the court was correct in refusing to treat it as such.

Appellee's remaining cross-assignments are urged only in the event of a reversal, and as we conclude the judgment should be affirmed, they will not be considered.

Judgment affirmed.

SWEARINGEN, J., entered his disqualification in this case.

On Motion for Rehearing.

[14-16] In this case it is very true that plaintiff's suit was not only to set aside the partition agreement, but also the judgment of the court, which recites that it was based upon such agreement and upon evidence to the effect that said agreement made a fair division of the property. It is contended that the agreement is really merged in the judgment, and this is practically correct, for a judgment setting aside the agreement would be of no assistance to plaintiff as she would still be confronted with the judgment. Her

theory is that she was induced by fraud to enter into the agreement partitioning the property, and that, relying upon the representations which induced her to make the agreement, she took no steps to controvert or set aside such agreement when it was introduced in evidence, and that she did not ascertain the falsity of such representations until she returned to Texas in 1913; that the judgment was based upon the agreement procured from her by fraud, and if it was based to any extent upon other evidence, such evidence consisted of perjured testimony. Appellant contends that, having held that, in so far as the right to set aside that part of the judgment decreeing a divorce is concerned, plaintiff is barred by limitation, it follows that we should hold the same as to the cause of action relating to property rights, it being clear that plaintiff knew the suit involved the question of the division of the community property. There is a difference to be borne in mind in considering the two causes of action. Plaintiff knew as soon as she knew the judgment was rendered whether or not, as to the divorce portion, it had been rendered on false testimony, and that the testimony related to facts with which she was conversant, and if the testimony was false, her failure to testify was such an act of neglect that she was in no position to ask that said portion of the decree be set aside. As a matter of fact, she relied most strongly upon setting aside that part of the decree on the theory that the court was without jurisdiction, contending that she had not been served with citation. The portion of the decree relating to property rights was rendered upon an agreement claimed by her to have been made by reason of false representations made to her, and upon testimony of her husband, who, she had a right to assume, was the only person having knowledge whether or not he had lost all of the community estate except the amount she states he told her he still had. It cannot be said that as to the rendition of this part of the decree she was in fault for believing the representations and assuming that the agreement was in all respects legal, and in failing to appear and cross-examine her husband. It is said in the motion that where a party fails to appear and answer he cannot subsequently maintain an action to set aside a judgment obtained upon false and perjured testimony because of the neglect of the defendant to appear and answer in the suit, when, by so doing, the fraud or perjury could easily have been disclosed. The rule thus stated is doubtless frequently applicable, but two reasons suggest themselves why it is not applicable to this case. In the first place, plaintiff alleged and proved to the satisfaction of the jury that defendant, instead of merely serving her with citation and copy of petition and letting her come into court and settle their property rights, by fraudulent representations procured an agreement

from her which not only fixed all such rights, but which operated to induce her not to come into court to settle such rights. In the second place, as her husband was the only person who could testify that said agreement was a fair division, he must have done so, unless the part of the decree reciting that evidence was introduced showing the fairness of the agreement was inserted by mistake, and it is by no means clear that the fraud or perjury could have been easily exposed.

In the case of McMurray v. McMurray, 67 Tex. 665, 4 S. W. 357, the wife, who was sued for divorce and for division of the community property, failed to attend the trial, being situated very similarly to plaintiff herein, but was represented by an attorney. A decree was entered, and she afterwards brought suit to set aside such decree on the ground that it was rendered upon false testimony given by her husband. The Supreme Court, speaking through Judge Stayton, held that her petition stated facts which entitled her to a re-examination of the question of community property, and to the value of such additional part thereof as in connection with that already decreed to her would give her a share equal to that which the defendant under the law was entitled to retain. According to her contentions it reasonably appeared that had she been present and testified with regard to the grounds upon which the divorce was sought she might have prevented the divorce from being granted, but her failure to do this was evidently not considered by the court as a fraud upon the court or as affecting her right to set aside the decree in so far as it affected property rights.

It is contended in the motion that:

"If the agreement was fraudulent, it would occupy the same attitude as any other false or perjured testimony which constituted the basis of the judgment."

It is also contended that a decree will not be reopened because of the falsity of the testimony by which it was obtained, but only because the injured party has been deprived of her right to appear at the trial by some fraud of the opposite party. We do not know whether any very good distinction could be drawn between fraud which deprives a party of knowledge that the trial will take place at a certain time, and fraud which induces a settlement of the controversy, and leads the other party to believe that the attendance at the trial would be a useless formality. But be this as it may, we do not understand that our decisions bear out the theory that in no case will a decree be set aside upon the ground that it was obtained because of false testimony. Several of the cases referred to in the motion were discussed in the case of McMurray v. McMurray, supra, and our Supreme Court held that such false testimony in itself constituted fraud, using the following language:

"That the willful giving of false testimony by a party to an action in relation to a matter af-

fecting an issue to be tried is fraud of the most pernicious character cannot be questioned, and for such conduct it has been held that the injured party is entitled to have the cause re-examined."

This court in the case of Avocato v. Dell'-Ara, 84 S. W. 443, has followed the McMurray Case, and it has been cited and followed in other cases.

In the case of Davis v. Jones, 149 S. W. 727, it was held that a judgment rendered upon false testimony could be set aside in a suit filed six years after its rendition; it being alleged and proven that appellee, without fault on his part, failed to discover such fact until within a reasonable time before filing his suit to set aside the judgment.

[17] We conclude that if false testimony is willfully given by a party to the suit or by others by his connivance or procurement, and if the other party cannot be charged with negligence in failing to prevent judgment being rendered upon such testimony, our courts will entertain a suit to set aside the judgment.

There being no such negligence on the part of plaintiff as would have prevented her from maintaining a suit within the statutory period to set aside that part of the decree relating to property rights, the only other question is whether her suit is barred by limitation. Appellant attacks both the pleadings and evidence on this issue. It is true that she alleges her diligence and want of knowledge by stating a conclusion, but in connection with such conclusion other facts alleged by her must be considered. The petition discloses that the entire community estate was reduced to money and notes, and her husband had been in possession thereof for a year, during which time she resided in California; that being estranged from her parents on account of her marriage to defendant, she decided to return to California after making the agreement at El Paso, because her brother, who was the only relative with whom she maintained friendly relations, resided there; that relying upon defendant's promises to support her and their three children, she invested the $1,200 in a home in California, and, receiving no assistance from him, was compelled to earn a living for herself and children, and had no means to investigate the facts or to go to Texas until the summer of 1913. She charges a conspiracy between her husband and others, which she alleges had its inception prior to the sale of all of their community property, and which was for the purpose of securing to him the bulk of the estate, and that she never learned of this scheme until the summer and fall of 1913, and then proceeds to allege what was done under such conspiracy as discovered by her in 1913. She alleged that when she did go to Texas she learned that the report had been circulated at Sonora, their former home, that defendant had given her $10,000 as her share of the community

property, and that such report had probably been started by a statement by him to that effect. The petition is long and involved, and there may be other facts which have a slight bearing, but the foregoing are the most prominent.

[18] Plaintiff shows that she did not suspect the falsity of the allegations with regard to the extent of her husband's losses until she came to Texas. In the McMurray Case, the court stated that as to community property, a husband is in a restricted sense a trustee for his wife, bound to good faith, and derelict in duty if he conceals knowledge from her necessary to enable her to protect her rights, and that withholding needed information from her is a breach of duty constituting fraud. In this case the allegations show such concealment of the fraud as would prevent the statute from running until the fraud is discovered or by the use of reasonable diligence might have been discovered. The rule to be applied has been stated by Judge Neill, in Pitman v. Holmes, 34 Tex. Civ. App. 487, 78 S. W. 961, as follows:

"The ordinary rule is that in order that it may appear that reasonable diligence has been exercised by plaintiff, or that he has been guilty of no laches, to discover, or in failing to discover, the fraud, he must allege the fact upon which he relies, so the court may determine from the pleadings whether he is entitled to the relief sought, assuming such allegations are true. If from such allegations the court can say as a matter of law that by the exercise of reasonable diligence plaintiff could have discovered such fraud within such time as his action would have been barred when the suit was filed, then his petition would be subject to such exceptions as are urged against the plaintiffs by the assignments of error now under consideration. If, on the other hand, the court cannot so say from the allegations, the question is one of fact, and must be submitted to the jury."

[19] The rules of law are well established, but in applying them to the facts of a case great difficulty is frequently experienced, and it appears to us that sometimes they have been so applied as to practically require the injured party to become suspicious right after the deal is consummated, and start an investigation, although no new facts have come to his knowledge. On the other hand, in some of our cases it is considered that the party is justified in remaining inactive until he has knowledge of some fact which would put him upon inquiry whether the representations were false. Coleman v. Ebeling, 138 S. W. 199–204; Isaacks v. Wright, 50 Tex. Civ. App. 312, 110 S. W. 970; Smalley v. Vogt, 166 S. W. 1. Each case must be decided upon its own facts, and the conduct of the party must not be judged by what a very cautious and suspicious person would have done under the same circumstances, but by what a person of ordinary prudence, situated as was plaintiff, would have done. The question presented by the exceptions to the petition is a close one, under our decisions, but we believe it cannot be said, as a matter of

law, that by the exercise of reasonable diligence plaintiff could have discovered the fraud within such time that her action would have been barred when she filed suit. The question, whether the finding of the jury with reference to the issue of negligence is supported by evidence, is also a close one, but we conclude that we cannot say the evidence does not support such finding.

The motion is overruled.